POND *against* SMITH and others.

New.Haven,
July,
1822.

Pond
*v.*
Smith.

Where *A.* had a separate demand against *C.*, who was insolvent, and *C.* had a demand against *A.* and B. jointly; it was held, that chancery might apply the former demand in satisfaction of the latter.

A trade, by a neutral, in goods contraband of war, is a lawful trade

Therefore, a demand arising out of a voyage from the *United States*, the object of which was, to sell the cargo, consisting of fire-arms and munitions of war, to either of two belligerent powers, with whom the *United States* were at peace, or to any other persons, was held not to be illegal; although such cargo was, undoubtedly, contraband of war, and liable to confiscation, by either of the belligerent powers.

The plaintiff, being a joint owner with the defendants of a vessel, proceeded with her from the *United States,* to the port of one of two belligerents, with whom the *United States* were at peace, and there fitted her out as a privateer, and cruised with her against the subjects of the other belligerent; which enterprise was either originally authorized, or subsequently approved, by the defendants. In a suit in chancery, for the application of a proportion of the expenditures of the plaintiff in such enterprise, to a debt due from him to the defendants, it was held, that the object for which these expenditures were made, being illegal, a court of chancery would leave the parties, with respect to them, where it found them.

A demand growing out of an illegal transaction, which cannot be recovered or enforced directly, cannot be set off at law, or be made the foundation of a proceeding in chancery for an injunction, against a legal demand.

No recovery can be had in favour of one of several part owners of a vessel, against the others for disbursements made by him for outfits and insurance, in pursuance of an original understanding between the owners, to employ the proceeds of the vessel and cargo in privateering unlawfully against the commerce of a foreign power; although there was also an understanding, that the prime cost of the enterprise should be remitted to the owners, before the privateering was to commence.

But if the disbursements were made by such part owner, with a sole view to some legal voyage, a subsequent agreement to convert the proceeds of vessel and cargo to illegal purposes, would not deprive him of his claim on the other owners, for a reimbursement.

Where a case was reserved in the superior court, for the advice of this court, on a bill in chancery, and the finding of the committee thereon, and it appeared, that the allegations in the bill were not adapted to the relief, which the facts found might furnish; this court, in the exercise of a sound discretion, remitted the case to the superior court, to give the plaintiff an opportunity to amend his bill.

This was a bill in chancery.

In *November*, 1816, the plaintiff, with *Smith & Hubbell* of *New-York*, built a schooner, called the *Ellen Tooker*, by an agreement with one *Abraham Riviere*, a carpenter, at an expense of 4,800 dollars for the hull; to be owned, when completed, one half, by *Smith & Hubbell*, and the other half, by the plaintiff. They finished her, at an expense, with the

cost of building, of 10,025 dollars. She was designed for a voyage of enterprize. *Smith & Hubbell* were to make all the advances, keep the accounts, and manage the concerns of the schooner, while in *New-York;* and the plaintiff was to command and navigate her, and manage her concerns abroad. Before her cargo was purchased, the plaintiff sold one fourth part of her to *S. A. Lawrence;* and soon afterwards, became a joint and equal proprietor with *C. H. Pond* of the remaining fourth part, and jointly liable for the fourth part of the expenses, which had arisen in relation thereto; but *C. H. Pond* and the plaintiff were not, at that time, or afterwards, merchants in company. Soon after this concern was formed, *Smith & Hubbell*, as agents of the concern, made the disbursements for the outfit of the vessel, in view of a voyage to the *Gulf of Mexico;* and, in the same capacity, purchased her cargo, consisting of fire arms and munitions of war, to the amount of 21,356 dollars, 84 cents. On the 5th of *February*, 1817, the plaintiff sailed on the voyage to the *Gulf of Mexico;* sold the cargo, but was prevented from delivering it; returned to the *United States;* his proceedings were reported to *Smith & Hubbell*, and approved by them; the cargo was abandoned to the underwriters, who refused to accept it; it was then sold for the benefit of whom it might concern, and bought in by the agent of this concern.

On the 20th of *September*, 1817, the vessel, with her cargo, consisting of fire arms and munitions of war, owned by the concern, in the proportions above stated, sailed on a voyage to *Buenos Ayres*, under the command of the plaintiff, with *G. W. Hubbell* on board as super-cargo, with instructions given by *Smith & Hubbell*, the agents of the concern; who also sent on board certain *German* goods, which were their private adventure. The plaintiff was also authorized verbally, by the agents, *Smith & Hubbell*, after making such remittances to them as should be sufficient in amount to reimburse to the concern all the costs of the vessel and cargo, and the expenses incurred up to the commencement of the last mentioned voyage, to invest and use the surplus in such speculations as he might deem, in his discretion, for the best interest of the concern; and, if he thought fit, to invest the surplus, and employ it in privateering, and capturing the property of the belligerents, in cruisers commissioned by powers carrying on wars in those seas.

The plaintiff went with the vessel and cargo to *Buenos*

*Ayres ;* and arrived there on the 21st of *November* following. The cargo was landed, and committed to the care of *G. W. Hubbell ;* and the vessel, for the purpose of converting her into a privateer, was ostensibly, but not really, sold, by the plaintiff. to a citizen of *Buenos Ayres.* The plaintiff was then naturalized, and took a commission to cruise, and capture all property on the high seas, belonging to the king of *Spain,* or his subjects. Thus commissioned, the plaintiff, in *February,* 1818, sailed with the vessel, bearing the name of the *Cyripo,* as master and commander thereof, on various cruises, and made several captures; " all which," the bill alleged, " was done in pursuance of an original agreement, entered into, by the original owners, at the time she sailed from *New-York* to *Buenos Ayres.*" In this business, the plaintiff expended large sums of money ; paid out to *Smith & Hubbell* diamonds, and gold lace, and a snuff box, all of the value of 400 dollars ; received in money 646 dollars ; and in paying the men, who had been on board the *Cyripo,* their proportion of the prize money, and in other expenses of the vessel, and of the property captured, advanced the sum of 3,534 dollars. He soon afterwards purchased one half of a privateer, or armed schooner, called the *Tantivy,* for which he gave 6000 ; and leaving her on a cruise, he returned to the *United States,* where he arrived in *September,* 1818. While he was here, *Smith* took one half of the plaintiff's right in the *Tantivy,* at the price of 3000 dollars. The plaintiff. about the same time, gave *Smith & Hubbell* a general history of his transactions abroad ; and they did not express any disapprobation thereof.

In *October,* 1818, the plaintiff went again to the *West-Indies,* with instructions from *Smith.* On his arrival at *St. Bartholomews,* about the 10th of *November,* 1818, the *Tantivy* was out on a cruise. In about three weeks afterwards, she came in, with three valuable prizes ; which were all taken from her, as she was making her port, and were wholly lost. The *Tantivy* herself was soon afterwards sold to pay her repairs, and lost. In *January,* 1819, the plaintiff purchased two schooners, the *Prince of Orange* and the *Favourite,* both engaged in privateering for *Spanish* property ; and, on the 1st of *February,* paid out therefor, the sum of 6,908 dollars ; but they were soon afterwards captured and lost.

At *Buenos Ayres,* the plaintiff became personally responsible, by his own bond, in the sum of 10,700 dollars, for the

outfits of the *Ellen Tooker*, when she was fitted, by the name of the *Cyripo*, for her cruise from that port. The cargo carried to *Buenos Ayres* from the *United States* was in part sold, *viz.* the *German* linens, for 2,313 dollars, 99 cents, nett proceeds, which were applied towards the expenses and charges of the plaintiff in fitting out the privateer, as were also the avails of part of the cargo belonging to the whole concern ; leaving the sum of 7,333 dollars, 47 cents, still due on the plaintiff's bond. How much of the cargo remains unsold, and what part was applied in payment of the personal expenses of the plaintiff and *G. W. Hubbell*, the committee could not ascertain ; but they found, that no part had been remitted to the *United States*.

Smith & Hubbell became insolvent, and assigned their property to *S. Tooker* & Co., after which, *Smith*, as surviving partner of *Smith & Hubbell*, commenced an action at law against the plaintiff and *C. H. Pond*, demanding 4,500 dollars for disbursements relating to the *Ellen Tooker ;* which is still pending in the superior court, and is prosecuted for the benefit of the creditors of *Smith & Hubbell*.

The accounts of *Smith & Hubbell* with the plaintiff and *C. H. Pond*, commencing in *January*, 1817, and containing, among other charges, the insurance of the *Ellen Tooker*, for the voyage to *Buenos Ayres*, were found to be truly stated.

Wages to the amount of 556 dollars, 66 cents, were also found to be due to the plaintiff, from the concern, on the first voyage to the *Gulf of Mexico*.

The bill prayed for the production of the *Riviere* contract for the building of the schooner ; for an injunction against the suit at law ; and a final settlement of accounts.

*Joseph Smith*, surviving partner of *Smith & Hubbell ; S. A. Lawrence*, owner of one eighth part of the schooner ; *C. H. Pond*, owner of one eighth part ; and *Samuel Tooker & Co.* assignees of *Smith & Hubbell ;* were made party defendants.

The case was reserved for the consideration and advice of all the judges as to what decree, if any, ought to be passed, and what further proceedings ought to be had.

*Staples* and *R. I. Ingersoll*, for the plaintiff, contended, 1. That the plaintiff was duly authorized to do all that he did do ; *Smith & Hubbell* being the general agents of the concern at home, and the plaintiff the general agent abroad. This au-

thority of the plaintiff is evinced, first, by a previous delega-tion; and secondly, by a subsequent ratification. *Codwise &* al. v. *Hacker,* 1 *Caines* 526.

*New-Haven,*
*July,*
*1822.*

*Pond*
*v.*
*Smith.*

2. That the plaintiff being a joint owner, and agent for the concern abroad, what money he has paid, at the express or implied request of the concern, is well paid ; and they cannot say they will call the plaintiff to account for the money ; nor, if paid on account, can they sue for that account, and say that it is not paid. This is the great leading principle in the case ; and facts enough are found to enable the court to apply the principle, and say, that the plaintiffs in the suit at law shall not recover, and grant an injunction.

3. That the plaintiff had paid out more money for the concern, than the concern could justly claim from him. The counsel then proceeded

4. To anticipate and answer objections.

*Daggett* and *N. Smith,* for the defendants, contended, 1. That *S. A. Lawrence* was entitled to a decree against the plaintiff for his costs ; he not having consented, or been knowing, to any agreement, verbal or otherwise, to employ the schooner or cargo in any unlawful commerce or enterprize.

2. That the court could not go into any examination of the claims of the plaintiff, arising out of his conduct at *Buenos Ayres,* in converting the schooner into a privateer ; disposing of the cargo, and giving bond for the outfit of such privateer ; or any of his subsequent transactions, in cruizing or privateering against the property of the king of *Spain,* or of his subjects ; because all these transactions were in direct violation of the laws of the *United States. Vol.* 3. *p.* 1.

3. That *Smith,* as surviving partner of *Smith* & *Hubbell,* was entitled to a decree, that in a suit at law, in which the body of one of the defendants is attached, judgment be rendered for the balance of the account ; as this account is truly charged, and arose out of disbursements made before any illegal agreement was entered into.

4. That if the verbal agreement, made at the time the vessel sailed on her voyage to *Buenos Ayres,* could affect any part of the account, it would affect only that part charged for money paid out for insurance, and which would, upon that principle, be deducted therefrom ; every other part of the expense of the schooner and cargo having been incurred, and, of

course. the plaintiff and *C. H. Pond* having become liable for their proportion thereof, before the agreement was made.

5. That the illegal verbal agreement found, was not, that the plaintiff should commence any illegal commerce or enterprize : It was only, that if any surplus remained, after remitting the full amount of vessel and cargo and expenses, such surplus might be so employed ; whereas it is found, that he, immediately on his arrival at *Buenos Ayres*, employed vessel and cargo in unauthorized and illegal enterprizes ; and the charge of insurance, therefore, ought not to be deducted.

6. That the private shipment of the *German* linens was not embraced by the agreement ; and, of course, *Smith*, as surviving partner, has a fair claim for them against the plaintiff.

BRISTOL, J. The object of this bill is to apply a separate demand in favour of *Adam Pond*, individually, against *Smith & Hubbell*, to the satisfaction of a demand in favour of *Smith & Hubbell* against *Charles H. & A. Pond* jointly. This application is founded on the *insolvency* of *Smith & Hubbell*, which is alleged in the bill, and found by the committee. As a separate demand in favour of *C. H. & A. Pond*, against *Smith & Hubbell*, could not be applied at law, by way of *set-off*, to the demand in favour of *Smith & Hubbell* against the two *Ponds*, it would be inequitable, that the former should recover satisfaction for their whole demand ; leaving *A. Pond* to pursue his remedy against them, when, from the intervention of *insolvency*, no satisfaction of the demand could be obtained. Hence, the interference of a court of chancery is indispensible ; and it becomes necessary to inquire to what extent *Adam Pond* has succeeded in establishing his demand against *Smith & Hubbell*.

It is hardly necessary to observe, that *Adam Pond*, to obtain the set-off which he seeks, must establish his *debt* against *Smith & Hubbell*, as effectually, as though he had sued them in a court of law. Whether he pursues his remedy at law, or in chancery, in either case his demand must not rest on a violation of law for its foundation : it cannot arise out of illegal acts, opposed to laws, which he is bound to obey ; nor depend or conduct *contra bonos mores*, or sound policy.

The demand in favour of *Adam Pond*, to which the attention of the court is first called, arises out of a voyage to the *Gulph of Mexico*. The plaintiff sailed as captain of the *El-*

*len Tooker*, owned by *S. A. Lawrence*, *Smith & Hubbell* and *C. H. & A. Pond*, with a cargo of fire-arms and munitions of war. The object of the voyage was, to sell this cargo, either to the Patriots, who were then in arms against the royal government of *Spain*, or to any other persons, who might purchase the same. This cargo was, undoubtedly, contraband of war ; and would be liable to confiscation, if captured either by the patriot or royal forces. But, it does not from thence follow, that the voyage was illegal, so as to deprive the captain of his wages, or defeat any other demand, which may arise out of the purchase or shipment of the cargo.

It may be said, that the law of nations is a part of the municipal law of every sovereign or independent state ; and by that law, commerce in contraband of war, is prohibited to the citizens of a neutral country. In answer to this argument, *Kent*, J. (in *Seton & al.* v. *Low*, 1 *Johns. Ca.* 1. 5.) observes, that though this reasoning may be plausible, the fact is, that the law of nations does not declare the trade in contraband to be unlawful. It only authorizes the seizure of the contraband articles, by the belligerent power : and this it does from necessity. A neutral nation has nothing to do with the war ; and is under no moral obligation to abandon or abridge its trade ; and yet, at the same time, from the law of necessity, as *Vattel* observes, the powers at war have a right to seize and confiscate the contraband goods ; and this they may do from the principle of self-defence. The right of the hostile powers to seize, does not destroy the right of the neutral to transport. They are rights, which may, at times, clash and injure each other. But this collision is the effect of inevitable necessity ; and the neutral has no just cause to complain. A trade by a neutral in articles contraband of war, is, therefore, a *lawful trade* ; though a trade, from necessity, subject to inconvenience and loss. I see, therefore, nothing in the voyage to the *Gulph of Mexico*, which can stamp it with the character of *illegality*; or deprive the plaintiff of the reasonable reward, which has been ascertained by the committee. The proportion, therefore, of these wages, which is due from *Smith & Hubbell*, ought to be applied, in part satisfaction of their demand, against *A. & C. H. Pond*, unless some sufficient reason to the contrary can be shown.

It has been urged, that *Smith & Hubbell* have a claim upon *Adam Pond* for the *German* linens, sold for something over 2,000 dollars, at *Buenos Ayres* ; which is more than sufficient

New-Haven,
July,
1822.

Pond
*v.*
Smith.

to counterbalance the demand for wages; and, of course, no decree can be passed in favour of the plaintiff.

At the time when the *German* linens were shipped, the instructions relative to privateering were communicated to *A. Pond*; *viz.* that the surplus, after remitting the prime cost, might be employed in fitting out privateers from *Buenos Ayres.* If these instructions extended to the *German* linens, as well as the rest of the cargo, the shipment would be illegal; as will be afterwards shewn, in examining another part of the case.

But whether the illegal instructions did, or did not, extend to these goods, is, in my opinion, immaterial. As the committee have found, that the *German* linens were sold, by the plaintiff, and the avails employed in fitting out the *Ellen Tooker* as a privateer, in violation of the act of Congress; and as this employment of the funds arising out of the *German* goods, has been subsequently approved, by *Smith & Hubbell*, it must now be taken, that they were shipped originally under an *agreement* to employ the proceeds in illegal enterprizes; and after they have been thus employed and *lost, Smith & Hubbell* can have no right, in *law or justice*, to recover the amount of *Adam Pond*, or to oppose this demand to any other lawful claim, which *Adam Pond* may have on them. The shipment of *German* linens, therefore, does not defeat the plaintiff's right of *set-off*, so far as respects his wages on the voyage to the *Gulph of Mexico.*

But the plaintiff has attempted to establish other demands against *Smith & Hubbell*, which, in my opinion, cannot be supported. The plaintiff, upon his arrival at *Buenos Ayres*, became naturalized in that country, and immediately proceeded to fit out the *Ellen Tooker*, under the name of the *Cyripo*, to cruise as a privateer against the subjects of the king of *Spain.* This enterprize proved unsuccessful. The privateer and her prizes were all lost. He purchased others, with his own funds, which were no more successful; and finally, after many disasters, the whole money, invested for this purpose, was totally lost. He now seeks to recover a proportion of the money thus expended from *Smith & Hubbell*, under a claim that they were jointly concerned in the enterprize, or, in other words, to *set off* this demand against the debt due from *C. H. & A. Pond* to *Smith & Hubbell*. From the facts reported by the committee there can be little doubt, that these enterprizes were originally authorized by *Smith & Hubbell*,

or subsequently approved ; and that the real understanding was, that they should be jointly interested in the concern. The difficulty, therefore, in this part of the case, attending the claim, does not arise from the privateering being unauthorised by *Smith & Hubbell*, but from the *illegality* of the *objects on which the money was expended*. The law of the land will leave the parties, as it respects these expenditures, where it finds them. It will not be endured, that parties should engage in *unlawful acts*, contrary to positive law, compromitting the peace and honour of the country, and then call upon a court of chancery to settle their accounts, adjust the respective balances and enforce payment.

But, it is said, there was a *running account* between the plaintiff and *Smith & Hubbell*, and, therefore, the latter ought not to be permitted to recover their demand, while they refuse payment to *Adam Pond*. If *Smith & Hubbell* have a legal demand upon *C. H. & A. Pond*, capable of being enforced in a court of law, it is not readily seen how a court of chancery can arrest their proceedings, because *Adam Pond* may have expended money, partly for their benefit, but under such circumstances that payment of it cannot be enforced, either in *law* or *equity*. The circumstance, that the demand of *Smith & Hubbell* is a *book account*, can make no difference. They have as good a right to a fair demand on book, as though it were due by bond or note : and it would exhibit a novel principle in our law, were it to be established, that a demand growing out of an illegal contract, which could lay the foundation of no recovery, either in law or equity, might still be enforced, by a *plea* of *set-off* at law, or would be a good foundation for a proceeding in chancery, to obtain an injunction against a legal demand.

It is urged, by the defendants, that as the plaintiff has brought his bill to obtain a settlement of the accounts ; as all the parties are before the court, and a full investigation has been had ; it will be proper, that the decree should settle the sum to which *Smith & Hubbell* are entitled in the suit at law. This claim has not been opposed, by the counsel for the plaintiff ; and upon a supposition that this course may be correct, it becomes necessary to examine the account of *Smith & Hubbell*, for the purpose of ascertaining the amount due them, and on what principle that amount is to be ascertained.

In discussing the claim of the plaintiff for wages on the voyage to the *Gulph of Mexico*, it has been shewn, that that

voyage was lawful ; that the cargo being contraband of war, did not render the voyage illegal as between the owners, but merely subjected the cargo to confiscation, if taken by either of the belligerents. The same principles govern in examining the demands of *Smith & Hubbell,* so far as respects the money expended for *C. H. & A. Pond* on the voyage to the *Gulph of Mexico.* Neither the cargo, nor the objects of the voyage, were illegal ; and whatever money *Smith & Hubbell* expended, either in the purchase of the cargo, or for *outfits* and insurance on that voyage, or in closing that voyage after her return, abandoning to the underwriters, &c., is, in the opinion of the court, a legal charge against *all concerned* ; to a proportion of which *Smith & Hubbell* are well entitled in the suit at law.

The *outfits* and *insurance* on the voyage to *Buenos Ayres,* present different questions ; and are attended, perhaps, with more difficulties. The vessel sailed upon this voyage, upon the 20th of *September,* 1817, under instructions authorizing the plaintiff to employ the whole proceeds of vessel and cargo, in privateering against the commerce of *Spain,* after first remitting to *Smith & Hubbell* a sum equal to the prime cost and expenditures. If the disbursements by *Smith & Hubbell,* in fitting the vessel for the voyage to *Buenos Ayres,* were originally made in pursuance of this illegal determination, the court are of opinion, that no recovery can be had for such outfits, although an understanding did exist, that the prime cost of the enterprise should be remitted to *New-York,* before the privateering was to commence. But if the disbursements for the outfits were honestly made, by *Smith & Hubbell,* with a sole view to some *legal voyage* merely, and not with any design, at the time, of employing the avails of the enterprize as above I do not readily perceive, how a *subsequent illegal agreement* would deprive *Smith & Hubbell* of their claim on the other owners for a reimbursement of the outfits. The right of *Smith & Hubbell* to charge the other owners, arises from making the disbursements, and *at the time* when the disbursements are made ; and it would seem, that their right to recover for such disbursements, could not be impaired, by a subsequent agreement of the owners to convert the proceeds of vessel and cargo to illegal purposes.

The *insurance* on the voyage to *Buenos Ayres* is understood to have been made by the procurement of *Smith & Hubbell,* *subsequently* to the sailing of the vessel for that place, and af-

ter the illegal orders given to the captain relative to priva-
teering; and, upon the principles adopted by the court, can-
not be allowed.

The question still occurs, was the determination to employ
the avails of the *Ellen Tooker* and cargo in privateering from
*Buenos Ayres*, entere d into, by the owners, *previous* to the
time when the outfits were furnished by *Smith & Hubbell*?
If the outfits were supplied *after* this determination, they
were furnished for an illegal purpose; and they are not en-
titled to recover this part of their account.

The committee find, that the parol orders or instructions
relative to privateering, were given at the time when the ves-
sel sailed from *New-York* for *Buenos Ayres* : and from this it
might, at first, appear, that no illegal design or agreement was
entered into, before this time. The orders to the captain do
not, however, constitute the illegal agreement itself, but are
the evidence from which such agreement is to be inferred.
Generally speaking, the instructions given to the captain on
the eve of sailing, must be regarded as evidential of the *ob-
jects* and *purposes* of the owners, which led to the voyage;
not merely the purposes and designs of the owners at the time
of giving such orders, or at the instant when the vessel is
about to sail; but also, those which induced the owners to
project the voyage, and in pursuance of which the disburse-
ments for the enterprize must be presumed to have been
made. Should a vessel be fitted out, and when every thing
is ready for sea, should the owners unite in a letter of instruc-
tions to the captain, directing him to proceed to the coast of
*Africa*, purchase a full cargo of slaves, transport them to the
*Havanna* or *New-Orleans*, and dispose of them in *slavery*, to
the best advantage; and should one of these owners after-
wards bring an action against the rest, to recover their
proportion of the outfits; no one can doubt but a jury, from
this letter, might and would infer, that the original object and
design of the voyage was *unlawful* ; and would, consequently,
find the plaintiff not entitled to any contribution. To sup-
pose that the vessel was fitted for sea, upon some *legal voyage*,
and that the parties had suddenly changed their minds, and
resolved to employ her in the slave trade, at the instant of
sailing; and that till that moment, no unlawful design or pur-
pose had entered their minds; would be doing violence to
probability; and to encounter so violent a presumption of the
enterprize being illegal, in its origin, would require strong ev-

idence of the real design and purpose of the voyage; and why the original purpose was abandoned, and a new and unlawful one substituted, in its place.

In addition to the inferences to be made from the instructions at the time of sailing, the ready approbation of *Adam Pond's* conduct, expressing no dissent to his proceedings, receiving a part of the prize property, and embarking in further enterprizes of the same illegal character, greatly strengthen the idea, that the original object of the voyage to *Buenos Ayres* was illegal; and that the outfits were furnished in pursuance of the same unlawful object.

The allegations in the plaintiff's bill, however, do not appear to me sufficiently broad to justify the Court in rejecting the charge for outfits on the voyage to *Buenos Ayres.*— The bill, after detailing the proceedings of *Adam Pond* at *Buenos Ayres;* his fitting out the *Ellen Tooker*, as a privateer, and cruising against the subjects of the King of *Spain*, &c. &c. proceeds to allege, that all this was done " *in pursuance of an original agreement, entered into, by the original owners, at the time she sailed from New-York to Buenos Ayres.*" The committee find the instructions given to Captain *Pond*, at the time of sailing, and the subsequent ratification of Captain *Pond's* conduct, in pursuing the unlawful enterprizes against the subjects of the King of *Spain*; and it has been shown, that from these facts, the illegal purpose or design of the owners probably existed, at a time anterior to the date of the illegal agreement stated in the bill, and previous to furnishing the outfits for the voyage to *Buenos Ayres.* If it did in fact exist previous to the supply of these outfits, and they were furnished to carry the unlawful enterprize into effect, this item of the account would be likewise illegal.

Under such circumstances, when the report of the committee appears to carry the illegal agreement further back than is stated in the bill, what course should the Court, in the exercise of a sound discretion, adopt, for the purpose of doing justice between the parties? It has been with a view to the exercise of this discretion, and not for the purpose of intimating prematurely an opinion on the weight of testimony, that some of the foregoing remarks have been made on the facts contained in the report of the committee; and upon the inferences to which these facts naturally lead.

The plaintiff in his bill, seems to have had no view of avoiding the demand of *Smith & Hubbell*, on the ground of illegali-

ty ; but of opposing to their entire demand a claim of his <span style="font-style:italic">New-Haven, July, 1822.</span>
own, to a much larger amount, which has failed him, on the
ground of illegality insisted on by *Smith & Hubbell*. And on
this account, his counsel may have been less careful with re-   *Pond v. Smith.*
spect to allegations in their bill, which impliedly concede
the legality of the claim for outfits on the voyage to *Buenos
Ayres.* But as, on the one hand, the Court have been obli-
ged to reject that part of the plaintiff's demand, which is ille-
gal ; so, on the other hand, we think that the plaintiff should
be permitted, if he thinks proper, to amend his bill, by sta-
ting that the illegal agreement between the owners was made
prior to the time when *Smith & Hubbell* furnished the outfits
for the voyage to *Buenos Ayres,* and that the outfits of that
voyage were furnished by *Smith & Hubbell* in pursuance of
such unlawful agreement : and if this amendment should be
made, that this new fact, thus introduced, should be again in-
vestigated, either by a committee, or the court, as the supe-
rior court, in their discretion, may direct.

The other Judges were of the same opinion.

Case remitted to superior court.